John I. TURNER, Dorothy H. Beckwith, Ben B. Reiff, Virginia O. Phillips, Deloye A. Duggan and Eleanor J. Olmsted, Plaintiffs–Appellants,

v.

UNITED CEREBRAL PALSY ASSOCIATION OF DENVER, INC., David Heartman, Executive Director, Defendants–Appellees.

No. 86CA1820.

Colorado Court of Appeals, Div. III.

Oct. 20, 1988.

Rehearing Denied Dec. 8, 1988.

Certiorari Denied April 24, 1989.

John C. Schaefer, Denver, for plaintiffs-appellants.

Karsh & Fulton, P.C., Alan E. Karsh, Denver, for defendants-appellees.

CRISWELL, Judge.

Plaintiffs (homeowners) appeal from a judgment denying their application for a permanent injunction to prevent the defendant, United Cerebral Palsy Association of Denver, Inc. (the Association), from using its property as a group home for eight developmentally disabled individuals in alleged violation of a private restrictive covenant. The trial court determined that the use being made by the defendant of its property was not in violation of that covenant. We affirm.

The Association purchased a house in a Denver subdivision known as Belmont Heights Filing No. 1, intending to use it as a group home for eight developmentally disabled adults. The Association's property is subject to a properly recorded private restrictive covenant which provides: "None of the building sites ... may be improved, used or occupied for any purpose other than private single family residential purposes...." The covenant does not, however, define the term, "private single family residential purposes," or any of the words comprising that term.

The Association's plan is to have the developmentally disabled adults reside in the house owned by it, which, in design, is intended for residential use. Their needs will be attended to by four full-time employees. While none of these employees is to reside on the premises, two of the four, on an alternating basis, will be present 24 hours each day. In addition, two part-time employees will be present to assist the eight residents when they arise in the morning and when they retire at night. Medical and other professionals will visit the premises from time to time to render various support services. None of the residents of the home or the staff will be related by blood, marriage, or adoption.

The essential purpose for this residential facility is to provide the residents with a family environment not found in an institutional setting. They will eat, sleep, bathe, and engage in recreational activities there. They will attend vocational schools during the day, shop at the neighborhood stores, and engage in other activities incident to normal day-to-day living. Thus, as viewed from without, the residents' activities will not distinguish this home from the other homes in the area.

Homeowners assert that this group of residents and employees will not constitute a "single family" for purposes of the recorded covenant. The trial court found, however, that the Association's purpose was to provide the residents with a home-style environment and that nothing within the covenant required the residents of a "single family" dwelling to be related either by blood or marriage. Noting that public policy requires zoning authorities to allow such a use in a single family zone district, *see* § 30–28–115(2)(a), C.R.S. (1986 Repl.Vol. 12A) and § 31–23–301(4), C.R.S. (1986 Repl.Vol. 12B), the trial court concluded that the group home contemplated here was a single family use for purposes of the covenant involved. We agree.

In considering this issue, we first note that, unlike the covenants at issue in *Evergreen Meadow Homeowners' Ass'n v. Dou-*

*ble D Manor, Inc.,* 743 P.2d 39 (Colo.App. 1987), and *Greenbrier–Cloverdale Homeowners Ass'n v. Baca,* 763 P.2d 1 (Colo. App.1988), there is no question here but that the covenant restricts the use of the property to use by a "single family," and it cannot be interpreted as restricting only the nature of the physical structure. *See D.C. Burns Realty & Trust Co. v. Mack,* 168 Colo. 1, 450 P.2d 75 (1969). Thus, unless the use of the residence by the group here can be considered to be a "private single family residential" use, the facial terms of the covenant would be violated.

However, the courts have recognized that the term "family" can encompass more than the conventional biological family. For example, in an early decision construing a covenant similar to the one here, the Michigan Supreme Court observed that the word "family" may be applied to any group comprising a "distinct domestic ... body." It rejected the contention that a family member must be related by blood or marriage and concluded that a group of priests living together, using the premises for private residential purposes, did not violate the covenant involved. *Boston–Edison Protective Ass'n v. Paulist Fathers, Inc.,* 306 Mich. 253, 10 N.W.2d 847 (1943). The emerging judicial trend is to apply a similar analysis in both zoning cases, *see White Plains v. Ferraioli,* 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756 (1974), and those involving private covenants restricting use. *See Knudtson v. Trainor,* 216 Neb. 653, 345 N.W.2d 4 (1984); *contra Shaver v. Hunter,* 626 S.W.2d 574 (Tex. App., 1981), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 377, 74 L.Ed.2d 510 (1982).

The Colorado Supreme Court also adopted this type of analysis in determining whether a home for mentally retarded children with surrogate parents constituted a single family use under the terms of a zoning ordinance. *See Hessling v. Broomfield,* 193 Colo. 124, 563 P.2d 12 (1977) (a case arising prior to the adoption of § 31–23–301(4), C.R.S. (1986 Repl.Vol. 12B)). *Cf. Roundup Foundation, Inc. v. Board of Adjustment,* 626 P.2d 1154 (Colo. App.1980) (where ordinance delineates the required familial relationships, a court is not at liberty to broaden the definition of "family").

Here, the covenant does not define the term "family" and nothing within the covenant requires the conclusion that it was the framers' intent to limit the term to a distinct, domestic group, occupying a structure as a single residential unit, who were also each related to each other by blood, marriage, or adoption. On the contrary, a reference to the other provisions of the covenant demonstrates that its purpose was to limit the location and nature of the structures to be erected, and the uses that might be engaged in, so as to prohibit general nuisances and annoyances and to create an attractive, low-density, pleasant neighborhood. Requiring the residents to be related by blood, marriage, or adoption would do little to forward the covenant's underlying purpose.

■ Thus, where, as here, the covenant at issue does not specifically describe the residential groups that the term "single family" was intended to include, and where there is presented no extrinsic evidence of the framers' intent, we cannot conclude, as a matter of law, that the covenant authorizes occupation of a dwelling only by a group constituting a traditional biological family.

■ This conclusion is particularly compelled in this case because the governmental agency having zoning authority over this property is required to treat this residential group as a single family for zoning purposes. Section 31–23–301(4), C.R.S. (1986 Repl.Vol. 12B). While that statute has no direct applicability to private covenants, it is some indication of the type of groups that might logically, as a matter of public policy, be included within the concept of a single family.

Considering the nature of the intended use of this property, then, we conclude that the record supports the trial court's finding that this group home constituted a single family for purposes of the covenant. That finding is, therefore, binding on appeal.

*Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979).

Moreover, nothing within the opinion in *Evergreen Meadows Homeowners' Ass'n v. Double D Manor, Inc., supra,* requires us to reach a contrary conclusion. While we concluded in that case that the use at issue was not, as a matter of law, a single family use, the factual circumstances presented there were markedly different from those portrayed by the record here. In *Evergreen Meadows,* it was intended that two separate structures, located approximately 150 feet apart, would be used to house some 16 emotionally disturbed children in a single operation and under common supervision. The covenant provided that "only one single-family dwelling [was to be] permitted on any site." The trial court found, and we agreed, that such an arrangement would have none of the "characteristics of a normal and permanent family unit maintaining the usual family-style living arrangement." The nature of the use of the property in *Evergreen Meadows,* therefore, was incompatible with the character of the neighborhood that the covenant was designed to protect.

Here, in contrast, the evidence of the group's intended use of the property supports the trial court's finding that the living arrangements were similar to those to be found in a typical family unit and were compatible with the single family character of the neighborhood.

Judgment affirmed.

TURSI and JONES, JJ., concur.